ESTATE OF LEE CHAGRA, DECEASED, JOSEPH ABRAHAM, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Chagra v. Commissioner
Docket No. 7887-86
United States Tax Court
T.C. Memo 1990-352; 1990 Tax Ct. Memo LEXIS 364; 60 T.C.M. (CCH) 104; T.C.M. (RIA) 90352; July 11, 1990, Filed *364 Decision will be entered under Rule 155. Towner Leeper and John Leeper, for the petitioner. Byron Calderon and C. Joseph Craven, for the respondent. HAMBLEN, Judge. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a deficiency of $ 193,364 in the Federal estate tax liability of the estate of Lee Chagra and an addition to tax of $ 48,341 under section 6651(a)(1). [1] After concessions by both parties, the issues to be decided are whether alleged debts of decedent are deductible claims against the estate under section 2053(a)(3), and whether petitioner is liable for an addition to tax under section 6651(a)(1) for failing to file an estate tax return by the prescribed due date. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Decedent, Lee Chagra (hereinafter decedent), died a resident of El Paso, Texas, on December 23, *365 1978. Decedent's widow, Joanne Chagra (hereinafter Mrs. Chagra), was appointed independent executrix of the estate of Lee Chagra (hereinafter the estate or petitioner) and filed a Federal estate tax return on July 21, 1983. Her brother, Joseph Abraham, Jr. (hereinafter "Mr. Abraham"), who had been a partner in decedent's criminal law practice between 1962 and 1967, served as the attorney for the estate of Lee Chagra. Mrs. Chagra died of cancer on January 10, 1986. Mr. Abraham, a resident of El Paso, Texas, was thereafter appointed temporary administrator of the estate of Lee Chagra and was serving in that capacity when the petition in this case was filed. Decedent and Mrs. Chagra frequently went to Las Vegas, Nevada, in 1975 and 1976 so that decedent could gamble at two casinos, Caesar's Palace and the Aladdin Hotel. Decedent and Mrs. Chagra usually stayed at Caesar's Palace and would often remain in Las Vegas for several days at a time. Decedent often wagered thousands of dollars in a day gambling at Caesar's Palace and the Aladdin Hotel. The employees of both casinos were very familiar with decedent and Mrs. Chagra, and the management, particularly at Caesar's Palace, considered *366 decedent a valuable customer due to his frequent visits and high stakes gambling at the casinos. While decedent was at the gaming tables in Caesar's Palace and the Aladdin Hotel, he would sign credit instruments commonly known as "markers" in exchange for a stack of gambling chips. Decedent's credit limit with Caesar's Palace and the Aladdin Hotel was substantial. Decedent kept a special credit card account with the Aladdin Hotel which had a credit limit in 1976 of $ 100,000 "per trip or [over] 14 days". On several occasions in 1976, decedent was advanced as much as $ 201,000 in chips in one day at Caesar's Palace. When decedent was advanced chips on credit, it was with the understanding that the chips were to be used for gaming at the tables. Decedent would place bets at the tables with some of the chips, but several times during a gambling session would hand many of the chips to Mrs. Chagra who would place them in her purse at the gaming tables and exchange them for cash at a cashier counter within either Caesar's Palace or the Aladdin Hotel. Similarly, decedent would take some of the chips he had obtained, either by signing markers or by winning bets, and exchange them for *367 cash at the cashier counters. Decedent and his wife would often return to El Paso, Texas, with thousands of dollars in cash, while unpaid balances totalling thousands of dollars remained on decedent's credit accounts at Caesar's Palace and the Aladdin Hotel. Credit managers from Caesar's Palace and the Aladdin Hotel were continually contacting decedent concerning his unpaid credit balances. Decedent made irregular, but numerous, payments on his accounts to bring his balance close to zero before signing more markers on his subsequent trips to Las Vegas. Caesar's Palace and the Aladdin Hotel never charged decedent any interest on his outstanding marker balances. Philip D. Stoner (hereinafter Mr. Stoner) is a certified public accountant with the El Paso accounting firm of Cox, Colton, Stoner, Starr & Co. Mr. Stoner performed accounting services for decedent and Mrs. Chagra from at least 1976 until the date of decedent's death. Mr. Stoner continued to prepare income tax returns for Mrs. Chagra after decedent's death. Decedent kept track of some of his gambling activities by keeping a handwritten gambling ledger. Mr. Abraham was aware of decedent's gambling ledger, but Mr. Stoner *368 was never given the gambling ledger. Among the accounts Mr. Stoner maintained for decedent was one entitled "gambling income" and another entitled "gambling debts". Mr. Stoner based the figures and dates of the "gambling income" account as follows: first, decedent deposited cash obtained from his gambling activities into the bank account of his law practice; next, personnel in decedent's law office classified the various bank deposit slips and cancelled checks of decedent, labelling the deposit slips representing the cash decedent had obtained from gambling activities as "gambling income"; and, then, Mr. Stoner received the deposit slips from decedent's law office and made bookkeeping entries in decedent's "gambling income" account which was kept on the accounting firm's computer system. Although Mr. Stoner was not aware of exactly how decedent incurred the liabilities reflected in the "gambling debts" account, he labeled the account as such because decedent told Mr. Stoner he owed certain sums to casinos in Las Vegas. At the time of his death, decedent owed $ 236,000 to Caesar's Palace and $ 160,000 to the Aladdin Hotel. The estate had not paid these debts at the time of trial. *369 Caesar's Palace wrote off decedent's debt on February 12, 1979, because Lee Chagra died. The Aladdin Hotel also wrote off decedent's debt. During the nine months following decedent's death, the estate's attorney, Mr. Abraham, consulted Mr. Stoner regarding the filing of a Federal estate tax return. Mr. Stoner gathered information and documents concerning decedent's finances and concluded that because the estate was insolvent an estate tax return need not be filed. Mr. Stoner informed Mr. Abraham, who informed Mrs. Chagra, the independent executrix of the estate at that time, that no Federal estate tax return needed to be filed. On July 21, 1983, following an inquiry by respondent, Mrs. Chagra filed a Federal estate tax return and listed the value of decedent's gross estate at $ 781,520. By statutory notice of tax deficiency dated March 17, 1986, respondent determined a deficiency in petitioner's Federal estate tax of $ 193,364 and an addition to tax of $ 48,341. The estate filed a petition on March 24, 1986, seeking a redetermination of its estate tax. One week prior to trial, Mr. Abraham filed an "Inventory, Appraisement and List of Claims" ex parte for decedent's estate with *370 the Probate Court of El Paso County, Texas. The probate court approved the document on the same day it was filed, February 2, 1988. The following debts of decedent were claimed as deductions by the estate but were disallowed by respondent. [2]
Lender of
Amount
Actually
Purported Debt
Claimed
Paid by Estate
Caesar's Palace
$ 236,000
-0-
Aladdin Hotel
160,000
-0-
Joseph Abraham, Sr.
80,000
$ 20,000
(Decedent's father-in-law)
Josephine Chagra
37,800
37,800
(Decedent's mother)
Joe Chagra
14,500
14,500
(Decedent's brother)
Ralph Swafford
12,000
12,000
Lanward Development
6,275
6,275
Corporation
Jubilee Glass Works 7,417
-0-
Robert Milkman
19,000
-0-
Jimmy Allen
3,000
-0-
Romo Trust
1,784
-0-
Trust Accounts
14,100
-0-
of estate
First State Bank
2,382
-----
(Acct. #126-045-0) The estate issued checks to Joseph Abraham, Sr., Josephine Chagra, Joe Chagra, Ralph Swafford, and the Lanward Development Corporation in the aggregate amounts of $ 20,000, $ 37,800, $ 14,500, $ 12,000, and $ 6,275, respectively. There was also a cashier's check, *371 dated September 22, 1971, representing a transfer of $ 12,000 from Ralph Swafford to Lee Chagra, decedent. The cashier's check was deposited in decedent's bank account at Southwest National Bank, El Paso, Texas. OPINION Initially, we must decide who bears the burden of proof. In general, the statutory notice of tax deficiency is presumed to be correct and petitioner bears the burden of proving that respondent's determination of its estate tax deficiency is in error. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). In particular, deductions are a matter of legislative grace and entitlement thereto must be shown by petitioner. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). However, petitioner argues that because the Texas probate court approved petitioner's "Inventory, Appraisement and List of Claims," respondent bears the burden of proof. Petitioner asserts that the probate court's decree creates a presumption as to the amount and deductibility of claims under Texas law and that, under Fed. R. Evid. 302 and Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), this Court is bound by that presumption as a matter of law. We disagree. Fed. R. Evid. 302[3] *373 provides *372 that "the effect of a presumption respecting a fact which is an element of a claim or defense as to which State law supplies the rule of decision is determined in accordance with State law." Fed. R. Evid. 302 limits the applicability of state-created presumptions to situations in which the claim or defense at issue has its source in state law. Fed. R. Evid. 302, Advisory Committee's Note; 1 Weinstein's Evidence, par. 302[02] (1989). Petitioner's contention that certain debts of decedent are deductible from the taxable estate is a claim raised under the Federal estate tax statute, and does not have its source in state law. Thus, Fed. R. Evid. 302 does not require us to apply a state-created presumption that the state probate court's decree establishes the validity of petitioner's claims. In Commissioner v. Estate of Bosch, 387 U.S. at 457, the Supreme Court held that "where the federal estate tax liability turns upon the character of a property interest held and transferred by decedent under state law, [a federal judge is] * * * not bound by the determination made of such property interest by a state trial court," but instead must look to state law as announced by the highest court of the state to be followed since "the State's highest court is the best authority on its own law." Commissioner v. Estate of Bosch, 387 U.S. at 465. When the probate court approved petitioner's document of claims against the estate, the court did not adjudicate the validity of the state property interests. Even if it had, we would still be required to decide independently any question of local property law raised by petitioner's claims as we believe the relevant states's highest court would decide the matter. Commissioner v. Estate of Bosch, 387 U.S. at 465. None of the Texas Supreme Court decisions cited by petitioner discuss a question of local property law relevant to the issues before us, and we therefore do not find them controlling. Section 2053 imposes two distinct *374 requirements. First, the purported claims against the estate must be allowable under state law and, secondly, they must be allowable under the regulations. Estate of Reilly v. Commissioner, 76 T.C. 369, 372 (1981). The phrase "'as are allowable by the * * * jurisdiction * * * under which the estate is being administered' * * * establishes a threshold and not an exclusive condition; the requirements of respondent's regulations must also be satisfied." Estate of Smith v. Commissioner, 57 T.C. 650, 661 (1972), affd. 510 F.2d 479 (2d Cir. 1975). Further, we noted in Estate of Posen v. Commissioner, 75 T.C. 355, 367-368 (1980), that "we do not believe that Congress intended to allow the integrity of the Federal estate tax to be undermined by the vagaries of State law." Section 20.2053-1(b)(2), Estate Tax Regs., addresses the effect of a court decree: The decision of a local court as to the amount and allowability under local law of a claim or administration expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends. * * * It must appear that the court actually passed upon the merits of the claim. This will be presumed in all cases of an *375 active and genuine contest. * * * Thus, a state court decree ordinarily controls the deductibility for purposes of Federal estate tax only where the proponent of the decree has established that all the facts necessary for deductibility under Federal estate tax were considered and found pursuant to the state court's inquiry. The probate court in El Paso, Texas, did not consider either the existence or the enforceability of petitioner's purported claims. Petitioner filed its "Inventory, Appraisement and List of Claims" more than nine years after decedent's death in contemplation of the trial before this Court. As we noted above, petitioner's claims were filed ex parte. The probate court did not adjudicate anything but merely approved petitioner's uncontested document on the same day it was filed. Accordingly, we reject petitioner's contention that the probate court's decree allocates the burden of proof to respondent. The value of a taxable estate, upon which the Federal estate tax is based, "shall be determined by deducting * * * claims against the estate * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered." Sec. 2053(a). *376 Furthermore, petitioner may deduct as claims only those that are "enforceable against the decedent's estate" and only amounts that "represent personal obligations of the decedent existing at the time of his death." Sec. 20.2053-4, Estate Tax Regs. Petitioner maintains that it is entitled to deduct the disputed claims against the estate under section 2053(a)(3). We first consider whether petitioner properly deducted two debts that decedent owed to the Aladdin Hotel and Caesar's Palace. Although the estate claimed only $ 14,000 as the amount owed to the Aladdin Hotel, the parties have since stipulated that decedent owed $ 160,000 to the Aladdin Hotel, as well as $ 236,000 to Caesar's Palace, on his date of death. Respondent contends that both debts are unenforceable gambling debts and allowed the estate no deductions for them. We agree with respondent. Despite the fact that gambling, where licensed, is legal in Nevada, the Nevada Supreme Court has long held that subject to certain statutory exceptions, which do not apply here, [4] gambling debts are "void and unenforceable." [5]Sea Air Support, Inc. v. Herrmann, 96 Nev. 574, 613 P.2d 413, 414 (1980); Craig v. Harrah, 66 Nev. 1, 201 P.2d 1081 (1949). *377 Petitioner, however, contends that the debts owed to the Las Vegas casinos are not gambling debts, but are bona fide loans and, therefore, enforceable by the casinos and deductible by the estate. According to petitioner, decedent incurred interest free loans when he signed markers on credit in exchange for chips and obtained cash for the chips. We look to the law of Nevada, the situs of decedent's transactions with the casinos, in order to determine whether the debts should be characterized as unenforceable gambling debts or enforceable, bona fide loans. Sec. 20.2053-4; Commissioner v. Estate of Bosch, supra. *378 The Nevada Supreme Court has focused on the objective purpose of a transaction in order to determine whether a gambling debt was incurred. In particular, the court examines the time and place of the transaction and whether the casino customer was gambling at the time he incurred the debt. If the advancement was made in a gambling establishment in full operation, by the proprietor or his agent, to one then, or immediately prior thereto, engaged in gambling and who ran short of money, the game still being in progress, or if his conversation or the circumstances indicated he intended to resume playing, the purpose of the advancement becomes clear. On the other hand, if the advancement was at a different place than a gambling establishment, or if same was not made at a time when recipient had been recently playing, and some other, legitimate, purpose is stated by the recipient, then no presumption or inference that the advancement was for a gambling purpose is justifiable from such circumstances. [Craig v. Harrah, 66 Nev. 1, 201 P.2d 1081, 1084 (1949).] Mrs. Chagra described circumstances that clearly give rise to a gambling debt under Nevada law. Decedent signed markers at the casinos' *379 gaming tables in exchange for chips while play was in progress. Furthermore, decedent would bet with a portion of each advance received before handing chips to Mrs. Chagra, and decedent would often lose his bets. Moreover, decedent apparently characterized the amounts owed to Caesar's Palace and the Aladdin Hotel as "gambling debts" to his certified public accountant, Philip Stoner. Decedent, an attorney, would not have reasonably wanted those amounts characterized as "gambling debts" if they were in fact bona fide loans. Moreover, we note that Caesar's Palace and the Aladdin Hotel did not attempt to enforce decedent's debts at the time of his death. Consequently, the gambling debts are disallowed under section 2053(a)(3). The next issue is whether petitioner is entitled to deduct three debts decedent purportedly owed to his father-in-law, Joseph Abraham, Sr.; his mother, Josephine Chagra; and his youngest brother, Joe Chagra, in the amounts of $ 80,000, $ 37,800, and $ 14,500, respectively. Petitioner produced checks issued by the estate representing payments on these alleged debts. However, none of these three alleged creditors were present to testify in support of petitioner's *380 allegations. Their absence suggests that their testimony would be adverse rather than favorable. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Furthermore, purportedly enforceable intrafamily debts are often not supported by full and adequate consideration and are instead gifts disguised as debts. See sec. 20.2053-4, Estate Tax Regs.; Estate of Davis v. Commissioner, 57 T.C. 833, 835 (1972); Estate of Pollard v. Commissioner , 52 T.C.741, 744 (1969). Petitioner has failed to establish that decedent received the proceeds of enforceable loans from these three individuals, and we conclude that these claims are not properly deductible. Sec. 2053(a)(3). We need not address, therefore, respondent's argument that the debt owed Joseph Abraham, Sr. is barred by the Texas statute of limitations. We next consider whether petitioner is entitled to deduct a debt decedent purportedly owed to Ralph Swafford. Petitioner submitted a cashier's check which represents a transfer of $ 12,000 from Ralph Swafford to Lee Chagra. The cashier's check is dated September 22, 1971, and was deposited in decedent's account at Southwest National Bank, *381 El Paso, Texas. Petitioner also produced a ledger, purportedly in decedent's handwriting, but showing an unidentified individual's initials, J.H.D., at the top of the document. The ledger is dated February 7, 1978, and apparently was prepared for purposes of an Internal Revenue Service audit. There is no entry on the ledger which corresponds to the transaction evidenced by the cashier's check. Petitioner directs the Court's attention to a $ 12,000 entry in the ledger on August 6, 1971, as evidence of the claimed debt. However, the ledger identifies the noted item as a repayment by decedent to Ralph Swafford, not a credit extension by Ralph Swafford to decedent. Petitioner has not proved that the cashier's check represents an enforceable claim against the estate. Sec. 2053(a)(3); sec. 20.2053-4, Estate Tax Regs. Accordingly, we disallow the claimed deduction. We need not, therefore, address respondent's contention that the Texas statute of limitations precludes enforcement of this unsubstantiated debt. The next issue for our decision is whether petitioner may deduct $ 6,275, purportedly due on an alleged note payable to Lanward Development Corporation. Decedent's temporary *382 administrator, Mr. Abraham, testified that decedent used the loan proceeds to purchase property from Lanward Development Corporation. A check issued by the estate payable to Lanward Development Corporation in the amount of $ 6,275 was submitted as evidence of the debt. However, petitioner failed to put an alleged promissory note or any other evidence of this transaction into the record of this case. Mere payment by the estate is not sufficient to prove that a claim is legally enforceable against it. See Propstra v. United States, 680 F.2d 1248, 1255 (9th Cir. 1982); Wolfsen v. Smyth, 223 F.2d 111 (9th Cir. 1955). Accordingly, we deny the deduction. Petitioner submitted a cost estimate of work to be performed by Jubilee Glass Works to show a debt in the amount of $ 7,417. According to Mr. Abraham, the writing is a bill for some work that was done in decedent's law offices prior to decedent's death. However, the document states on its face that it is merely an estimate for the work. Petitioner failed to offer a completed work order or any other statement from Jubilee Glass Works that the work was actually performed and that the company was not paid before decedent's death. Petitioner *383 has not met its burden in proving that this $ 7,417 is a valid claim against the estate, and we accordingly deny it as a deduction. We must next decide whether petitioner is entitled to deduct four debts decedent allegedly owed to Robert Milkman, Jimmy Allen, Romo Trust, and certain trust accounts in the amounts of $ 19,000, $ 3,000, $ 1,784, and $ 14,100, respectively. Petitioner presented no evidence whatsoever to prove when these debts were incurred, if at all, what transactions gave rise to them, or whether they were enforceable against the estate. Accordingly, petitioner has not met its burden of proof regarding these debts, and we disallow them as deductible claims against the estate. Sec. 2053(a)(3). The next issue to consider is whether petitioner properly deducted $ 2,382 for an overdrawn checking account at First State Bank in El Paso. The bank statement in evidence, numbered 126-045-0, indicates that the account was not overdrawn at the time of decedent's death. Additionally, there is no evidence to show that decedent was the owner of the checking account. Accordingly, we deny the deduction. The final issue we must consider is whether petitioner is liable for the *384 addition to tax under section 6651(a)(1) for failure to file a Federal estate tax return by the prescribed due date. For the year of decedent's death, a Federal estate tax return was required to be filed within nine months after decedent's death if decedent's gross estate exceeded $ 134,000. Secs. 6018(a)(1), (3); 2031(a); 6075(a). The value of decedent's gross estate exceeded $ 134,000, since it was reported on the estate tax return filed in 1983 as $ 781,520, and that figure was increased by petitioner's concessions. Decedent's estate tax return was accordingly due to be filed on or before September 23, 1979. Sec. 6075(a). Petitioner did not file the return by that date, nor did it file a timely request for an extension of time to file. In fact, the return was not filed until July 21, 1983, approximately 3 years and 10 months after the due date. Section 6651(a)(1) provides for an addition to tax for failure to file a timely tax return, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The burden of proof is on petitioner to show both (1) that the failure to file was due to "reasonable cause" and (2) that the failure did not result *385 from "willful neglect." United States v. Boyle, 469 U.S. 241, 245 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). To demonstrate "reasonable cause" sufficient to excuse the failure to file a return, a taxpayer must show that it "exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; see United States v. Boyle, 469 U.S. at 243. Petitioner concedes that the return was filed late, but argues that such failure was due to "reasonable cause" within the meaning of section 6651(a)(1). Petitioner maintains that Mrs. Chagra, the independent executrix of decedent's estate at the time the Federal estate tax return was due, reasonably relied on the legal advice of the estate's attorney, Mr. Abraham, who informed her that no estate tax return was required to be filed since the estate was insolvent. Respondent argues that Mr. Abraham did not actually rely on Mr. Stoner's conclusion that no estate tax return was required to be filed because Mr. Abraham "must have known" that the estate was not insolvent. Respondent *386 argues in the alternative that Mr. Abraham's reliance on Mr. Stoner's conclusion was not reasonable. We find respondent's arguments miss the mark. At the time the estate tax return was due, Mrs. Chagra, not Mr. Abraham, was responsible for filing the return. In United States v. Boyle, supra at 249, the U.S. Supreme Court made it clear that "Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor." Thus, whether Mr. Abraham reasonably relied on Mr. Stoner's advice is irrelevant. The proper inquiry is whether Mrs. Chagra, the independent executrix at the time the return was due, demonstrated reasonable cause sufficient to excuse her failure to file the return. The Supreme Court held in United States v. Boyle, supra at 250, that while engaging an attorney to assist in probate proceedings is plainly an exercise of "ordinary business care and prudence," the failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent to timely file, and such reliance is not ordinarily reasonable cause for a late filing under section 6651(a)(1). However, the Court distinguished the case from a situation in *387 which the taxpayer reasonably relies on the substantive tax advice of an accountant or attorney. When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. [Citation omitted.] "Ordinary business care and prudence" do not demand such actions. [469 U.S. at 251.] We find that petitioner has demonstrated reasonable cause sufficient to excuse its failure to file a return within the prescribed time. Mrs. Chagra received advice from Mr. Abraham, an attorney, that Mr. Stoner, an accountant, had concluded that no estate tax return needed to be filed. Mr. Abraham was Mrs. Chagra's brother, her husband's former law partner, and the attorney representing the estate. Mr. Stoner had been decedent's and Mrs. Chagra's accountant since at least 1976. *388 She had no reason to question Mr. Abraham's legal advice regarding whether an estate tax return needed to be filed. Accordingly, we find that Mrs. Chagra's reliance on Mr. Abraham's advice constitutes reasonable cause under section 6651(a)(1). To avoid the addition to tax, petitioner is also required to demonstrate that the failure to file a Federal estate tax return was not due to "willful neglect." Sec. 6651(a)(1). Willful neglect for these purposes is defined as a "conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. at 245. Petitioner has established that the reason petitioner failed to timely file was that Mrs. Chagra, the independent executrix at the time the return was due, reasonably relied on advice from her attorney that no estate tax return needed to be filed. Therefore, we find that petitioner's failure to file a Federal estate tax return was not due to willful neglect. Accordingly, we hold that petitioner is not liable for the addition to tax under section 6651(a)(1). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code of 1954, as amended and in effect as of the date of decedent's death, and rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although petitioner claimed only $ 14,000 as a deductible debt to the Aladdin Hotel, the parties subsequently stipulated to the fact that the decedent owed $ 160,000 to the Aladdin Hotel on his date of death.↩
3. In determining whether petitioner is entitled to deduct certain claims against the estate, we apply the rules of evidence applicable to trials without a jury in the U.S. District Court of the District of Columbia. Thus, the Federal Rules of Evidence govern. In addition, to the extent that they may be appropriate, the rules of evidence contained in the Federal Rules of Civil Procedure will apply. Rule 143(a).
4. Nevada legislation effective in 1983 made certain gambling debts legally enforceable provided they are evidenced by a credit agreement meeting certain requirements. Nev. Rev. Stat. sec. 463.361(1) (1983). The statute provides that only credit instruments accepted on or after June 1, 1983, are valid, and the statute has no impact on the instant case. Nev. Rev. Stat. sec. 463.368↩ (1983). 5. We observe that Texas courts also refuse to lend their process to the enforcement of gambling debts. Conner v. Autrey, 18 Tex. 427 (1857); Springer v. Sahara Casinos Co., 322 S.W. 2d 33↩ (Tex. Civ. App. 1959).